# IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| **RASHEED SIMPSON,** | : | **CIVIL ACTION** |
| *Petitioner* | : | |
| | : | |
| **v.** | : | |
| | : | |
| **JOHN E. WETZEL,** *et al.,* | : | |
| *Respondents* | : | **No.  15-4510** |

PRATTER, J.                                                              SEPTEMBER _8_, 2020

## MEMORANDUM

### Introduction

It is a hallmark of the law of the land that criminal defendants may only be convicted of the offenses charged if the state can prove each element of the offense beyond a reasonable doubt. To let a state conviction that falls short of this fundamental requirement stand would not only offend the Court, but, of course, violates the United States Constitution and an individual's due process rights under the Fourteenth Amendment. *In re Winship*, 397 U.S. 358 (1970).

The Third Circuit Court of Appeals has aptly summarized these bedrock principles:

> It is well-settled that "the Due Process Clause [of the Fourteenth Amendment] protects the accused against conviction except upon proof beyond a reasonable doubt of every fact necessary to constitute the crime with which he is charged." *In re Winship,* 397 U.S. 358, 364, (1970). A jury instruction that omits or materially misdescribes an essential element of an offense as defined by state law relieves the state of its obligation to prove facts constituting every element of the offense beyond a reasonable doubt, thereby violating the defendant's federal due process rights. *See Carella v. California,* 491 U.S. 263, 265 (1989) (per curiam); *see also Polsky v. Patton,* 890 F.2d 647, 651 (3d Cir. 1989) (no due process violation where jury instruction "did not omit any essential element of the crime charged").

*Smith v. Horn*, 120 F.3d 400, 415 (3d Cir. 1997) (additional internal citations omitted).

1

In this case, involving a multi-defendant, multi-object conspiracy to commit murder and robbery, Petitioner Rasheed Simpson and co-defendant Malik Bowers were convicted in 1997 of first-degree murder, kidnapping, robbery, possession of an instrument of crime, and criminal conspiracy. As a result, Mr. Simpson was sentenced to the death penalty and Mr. Bowers was sentenced to life in prison. After litigating his appellate and Post Conviction Relief Act rights for more than 20 years, Mr. Simpson now seeks federal habeas relief in part on the basis that the trial jury instructions for his case related to vicarious liability were so deficient that they violated his federal due process rights by permitting his conviction on first-degree murder without the Commonwealth of Pennsylvania having to prove his specific intent to kill. Because the Court agrees, and finds that the error can only undermine the integrity of Mr. Simpson's murder conviction on the first-degree murder charge, the Court grants Mr. Simpson's request for habeas relief.

## Background[1]

Mr. Simpson, along with three co-conspirators, kidnapped, beat, and held the victim in this case, Andrew Haynes, for ransom. Ultimately, Mr. Haynes was shot and slain.

**I.      Mr. Haynes is brought to and beat at Rasheema Washington's apartment.**

The events unfolded on the evening of December 8, 1993. Prior to being kidnapped, Mr. Haynes had been speaking to Allister Durrante near Mr. Haynes's home at 18th and Tioga Streets in Philadelphia. Mr. Haynes had left his apartment to get cooking oil. On his way home from that errand, Mr. Haynes was grabbed, forced into a waiting car, and driven away.

Thereafter, Mr. Bowers, Mr. Simpson's co-conspirator, brought Mr. Haynes to the apartment of his friend, Rasheema Washington. Mr. Bowers arrived with Mr. Simpson, Mr.

---

[1]      The background of this case is taken from the parties' recitation of the facts and citations to the trial record, as well as the state supreme court's decision on Mr. Simpson's direct appeal.

Durrante and an unidentified man. The kidnappers were armed and had Mr. Haynes's hands tied behind his back. They had also bound his legs. Once at the apartment, they threw Mr. Haynes down on the floor and beat him. All the while, they demanded money. Ms. Washington observed Mr. Durrante enter her bedroom to use her phone. At some point, Mr. Simpson joined him. At Ms. Washington's insistence, the four kidnappers left the apartment with Mr. Haynes.

## II.    Threatening phone calls

Stanley Hall and Clayton Duncan, neighbors of Mr. Haynes, learned of the kidnapping and went to Mr. Haynes's apartment. Moments after they arrived, the phone rang and Mr. Hall answered. The caller addressed Mr. Hall and asked Mr. Hall if he remembered the caller from a robbery of Mr. Hall several weeks prior to that evening. The caller also responded affirmatively when Mr. Hall asked if the caller was "Rasheed." The caller told Mr. Hall that the victim would be killed if the kidnappers were not paid $20,000 within fifteen minutes.

Mr. Hall then called Mr. Haynes's mother's house and spoke with Selvan Haynes, Mr. Haynes's brother. Selvan Haynes immediately came to his brother's apartment. The phone rang again and Selvan Haynes spoke with the caller. The caller said that they had Mr. Haynes and wanted $20,000 or they were going to kill the victim. Selvan Haynes attempted to reason with the caller because obtaining such a large sum of money in the available time would be impossible.

Selvan Haynes forwarded all the calls coming to Mr. Haynes's apartment to his own and then went to his mother's house. As he arrived home, the phone rang. The person on the phone again repeated the kidnappers' demands. During this call, Selvan Haynes offered the kidnappers about $3,000 as well as two older model cars in lieu of cash. The kidnappers rejected the offer. The kidnappers called again, and in this instance, they allowed the victim to speak with his brother. The group of kidnappers called one last time, and repeated their demands.

3

### III.     The authorities find Mr. Haynes's body.

Philadelphia Police Department officers responded to a report of a dead body found in a vacant lot at 18th and Somerset Streets later that night, a location in close proximity to both Ms. Washington's residence and the site of the kidnapping. When his body was found, Mr. Haynes's hands were tied behind his back and he was bound with duct tape. The death was ruled a homicide, and the cause of death was four gunshot wounds to the back of the head.

### IV.     Additional evidence

At trial, the Commonwealth of Pennsylvania presented testimony from Officer James Slavin of the Cheltenham Police Department. He testified that he was working a detail in the parking lot of the Cheltenham Mall and movie theater on December 16, 1993, days after Mr. Haynes was murdered. Officer Slavin noticed a car without license plates. He looked through the windshield and noticed a handgun on the floor of the car. Officer Slavin called for a supervisor and surveillance was set up to watch the car. When the movie let out, Mr. Simpson, Mr. Bowers, and Ms. Washington got into the car. The officers ordered the group out of the vehicle. Mr. Bowers was arrested and the gun seized. The others were allowed to leave. While the gun was not linked to Mr. Haynes's murder, over the objections of defense counsel, evidence of the gun was admitted for the limited purpose of showing opportunity to commit a crime. At the scene of the murder, no gun was ever recovered, and the bullet pieces removed from the victim's head were too damaged to conduct ballistics testing.

### V.     Trial and post-trial proceedings

Mr. Bowers and Mr. Simpson were tried together.[2]  On December 17, 1997, a jury convicted both men of first-degree murder, kidnapping, robbery, possession of an instrument of

---

[2]     Mr. Durrante was tried separately.

4

crime, and criminal conspiracy.  During the penalty stage of the proceedings, the Commonwealth offered the following in support of three aggravating factors: (1) Mr. Simpson was holding the victim for ransom at the time of the murder, (2) he had a significant history of felony convictions involving the use or threat of violence to the person, and (3) Mr. Simpson had previously been convicted of another murder before or after the offense at issue.  Mr. Simpson offered his age, his character, and the circumstances of the offense as mitigating circumstances.  Ultimately, the jury found the aggravators outweighed any mitigating circumstances.  A death sentence was pronounced.[3]

Mr. Simpson appealed to the Pennsylvania Supreme Court, raising six claims:

1. that the trial court erred by not granting a mistrial after the prosecutor elicited a witness's subjective feelings concerning her belief that petitioner was a violent person;

2. that the trial court erred in its jury instruction on accomplice and co-conspirator liability;

3. that the trial court erred by not granting a mistrial at the penalty phase when the prosecutor asked a defense witness about the possibility that petitioner might be pardoned;

4. that the trial court erred in not granting a mistrial when the prosecutor referred to Andrew Haynes's killing as an "execution" during closing arguments;

5. that the evidence was insufficient to sustain the jury's verdict; and

6. that the jury's verdict was against the weight of the evidence.

The Pennsylvania Supreme Court affirmed Mr. Simpson's conviction and sentence. *Commonwealth v. Simpson*, 754 A.2d 1264 (Pa. 2000).  The state court's determinations are a significant subject of the Court's review in this Memorandum.  At this point, suffice it to say the

---

[3]     He was also sentenced to additional sentences totaling 27 ½ to 55 years of imprisonment on the other convictions, all of which ran concurrently to his death sentence.

state court determined that there was sufficient evidence to sustain the conviction of first-degree

murder. It determined so on the following basis:

> The record establishes that [Mr. Simpson] and three other men abducted the victim and brought him to [Ms.] Washington's apartment. While there, [Ms.] Washington observed the group beat the victim and demand money. Also, as evidenced by the testimony of the victim's brother, [Mr.] Haynes, and the victim's friend, [Mr.] Hall, the group placed telephone calls threatening to kill the victim if they did not receive $20,000.00. In at least one of these calls, [Mr. Simpson] acknowledged that he was the person whom [Mr.] Hall knew as Rasheed. Sometime later that evening, the victim's dead body was discovered with four bullet wounds to the back of the head in a vacant lot close in proximity to both the site of the abduction and [Ms.] Washington's apartment. Moreover, about a week after the murder [Mr. Simpson] was with [Mr.] Bowers, one of his co-conspirators, when Montgomery County authorities arrested Bowers and confiscated a gun.

*Id.* at 1269.

> The state court went:

> Viewed in the light most favorable to the Commonwealth, the prosecution presented evidence to the jury to support a finding that [Mr. Simpson] willingly and consciously participated in the intentional killing of the victim. The evidence demonstrated that [Mr. Simpson] took part in a conspiracy to abduct the victim for ransom. The evidence further confirmed the Commonwealth's theory that the group followed through on their threat to kill the victim when the victim's brother failed to surrender the requested amount of money. While the police were unable to deduce exactly which of the kidnappers ultimately killed the victim, the prosecution still managed to produce evidence to support a finding that [Mr. Simpson], on his own, whether he actually pulled the trigger or not, maintained the requisite specific intent to take the victim's life. This clearly satisfies the statutory elements of first-degree murder, and the evidence is therefore sufficient to sustain the conviction.

*Id.*

Thereafter, Mr. Simpson's petition for re-argument was denied in 2000, and the writ of

*certiorari* was denied on June 25, 2001. *Simpson v. Pennsylvania*, 533 U.S. 932 (2001).

On September 17, 2001, Mr. Simpson filed a *pro se* petition for relief under the Pennsylvania Post-Conviction Relief Act, 42 Pa.C.S. § 9541 *et seq*. Counsel was appointed to represent him and entered an amended PCRA petition on petitioner's behalf, followed by a supplemental amended petition, raising numerous claims. The PCRA court dismissed the petition in 2005.

Mr. Simpson appealed to the Pennsylvania Supreme Court and focused on the following arguments:

(1) the prosecution violated his rights under *Batson v. Kentucky*, 476 U.S. 79 (1986), by exercising its peremptory strikes in a racially discriminatory manner;

(2) that the prosecution violated *Brady v. Maryland* 373 U.S. 83 (1963), by failing to disclose:

    i. the victim's criminal record;

    ii. that prosecution witness Stanley Hall was facing drug charges that were dropped approximately two months before petitioner's trial; and

    iii. that prosecution witness Tracena Cooper was a paid informant for the federal government at the time of petitioner's trial;

(3) that trial counsel was ineffective for failing to put Felicia Brokenbrough's information before the jury;

(4) that trial counsel was ineffective for failing to adequately investigate or confront Rasheema Washington about her purported motives to fabricate testimony against him, and that trial counsel was further ineffective for failing to obtain evidence that a man named Will Shepard, not petitioner, was in the car at the Cheltenham Mall movie theater on December 16, 1993, and was the true owner of the gun that Montgomery County police confiscated from that car;

(5) that trial counsel was ineffective for retaining a private investigator who was also conducting investigations on behalf of petitioner's co-defendant Malik Bowers;

(6) that the prosecution was erroneously permitted to introduce other crimes evidence, specifically evidence that petitioner attempted to rob and kidnap Stanley Hall about six weeks before the kidnapping and murder of Andrew Haynes;

(7) that the jury instruction on reasonable doubt was constitutionally infirm;

7

(8) that his penalty phase trial should not have been held jointly with that of his co-defendant Bowers;

(9) that trial counsel was ineffective for failing to adequately present mitigating evidence at the penalty phase hearing;

(10) that the penalty-phase jury instruction on aggravating and mitigating circumstances was erroneous;

(11) that the penalty-phase jury instruction on the preponderance of the evidence was in error;

(12) that the jury was improperly permitted to find two aggravating circumstances based on the same underlying set of facts;

(13) that trial counsel was ineffective for not adequately challenging the "significant history" aggravator;

(14) that petitioner was entitled to a "life means life" instruction and that the jury instruction that the trial court actually gave was inadequate;

(15) that the jury instruction on specific intent to commit first-degree murder was inadequate; and

(16) that trial counsel was ineffective for failing to assert that petitioner's due process rights were violated by delay prior to his arrest.

Finally, petitioner alleged that the cumulative effect of all of these errors should entitle him to relief even if no single error was found to meet the threshold for establishing actual prejudice.

The Pennsylvania Supreme Court rejected all of these claims, with the exception of his ineffectiveness allegations related to Rasheema Washington's purported motives to testify falsely and the failure to present Cameron Thompson as a witness, or use information from Mr. Thompson, who supposedly could establish that Will Shepard was in the car on the night of the Cheltenham Mall incident, not Mr. Simpson.[4] The Pennsylvania Supreme Court remanded for further proceedings on these issues. *Simpson*, 66 A.3d at 284.

_____

[4]      With respect to the specific intent instruction, the Pennsylvania Supreme Court held:

The PCRA court held an evidentiary hearing and concluded that the claims regarding Ms. Washington's supposed bias lacked any basis in fact and Mr. Thompson's testimony was unworthy of belief and had been fabricated. Thus, trial counsel was not ineffective for declining to investigate or present either witness for the proposed purposes. The court further concluded that Mr. Simpson was not prejudiced by counsel's decision not to pursue the meritless claims. Mr. Simpson appealed and the Pennsylvania Supreme Court affirmed. *Commonwealth v. Simpson*, 112 A.2d 1194 (Pa. 2015).

## VI.    Habeas proceedings related to Mr. Simpson and Mr. Bowers

Mr. Simpson filed a motion to stay his execution on August 5, 2015 in this Court, and filed his initial petition for writ of habeas corpus seven days later. Mr. Simpson filed an amended petition on March 22, 2016, which the Government moved to strike. In his amended petition, Mr. Simpson again raised numerous claims asserting his entitlement to habeas relief.[5] The Court denied

---

Appellant argues that during the guilt phase of his trial, the court incorrectly instructed the jury that it could find him guilty of first-degree murder on an accomplice theory of liability, without finding that he himself possessed the specific intent to kill Haynes. The PCRA court found this claim had been previously litigated on direct appeal. PCRA Court Opinion, 11/28/05, at 9. Appellant does not contest this conclusion, nor could he reasonably do so given our lengthy discussion of the instruction on direct appeal. *See Simpson,* 562 Pa. at 273–79, 754 A.2d at 1273–77. Critically, Appellant makes no attempt to cast this issue in terms of ineffectiveness. *See* Brief for Appellant at 92–96. Accordingly, the PCRA court correctly dismissed this claim without a hearing.

*Commonwealth v. Simpson*, 66 A.3d 253, 282 (2013).

[5]      In particular, Mr. Simpson raises several direct challenges and asserts his constitutional rights were violated because (1) the prosecutor and the trial court elicited Rasheema Washington's subjective feelings about Mr. Simpson's propensity for violence, (2) the trial court's jury instructions failed to instruct the jury that Mr. Simpson must personally harbor specific intent to kill in order to be found guilty of first-degree murder, (3) the prosecutor injected into the penalty phase of the trial a suggestion of the possibility of a pardon and the trial court failed to issue an adequate curative instruction or grant a mistrial, (4) the prosecutor referenced the murder as an "execution" during closing argument, and (5) Mr. Simpson was convicted of first-degree murder on the basis of legally insufficient evidence which did not prove beyond a reasonable doubt that he personally harbored a specific intent to kill. Mr. Simpson also contends his constitutional rights under the Fifth, Sixth, Eighth and Fourteenth Amendments were violated when (1) the Commonwealth exercised its peremptory challenges in a discriminatory manner and trial and direct appeals counsel failed to raise and litigate the claim, (2) trial counsel was ineffective for failing to object to the

Respondents' motion to strike, and the respondents responded to the petition on April 21, 2017.

Mr. Simpson filed a reply on May 23, 2017.

On September 30, 2016, Magistrate Judge Lloret issued a Report and Recommendation on

Malik Bowers's federal petition for writ of habeas corpus. *Bowers v. Wenerowicz et al.*, No. 13-

5550, 2016 WL 9306253 (E.D. Pa. Sept. 30, 2016). As addressed in greater detail *infra*, Magistrate

Judge Lloret concluded that the jury instructions used at the Simpson-Bowers trial were deficient

under federal due process standards because they relieved the Commonwealth of its burden to

prove that the defendants possessed the specific intent to kill required for a conviction of first-

degree murder. Magistrate Judge Lloret determined that Mr. Bowers was entitled to habeas relief

---

Government's discriminatory use of peremptory strikes, (3) due to prosecutorial misconduct and ineffective assistance of counsel, certain exculpatory and impeachment evidence was not presented in Mr. Simpson's defense, (4) the defense investigator Edward Geigert had a conflict of interest, (5) his counsel failed to object to the trial court's admission of other crimes evidence, failed to request that the jury be given an immediate curative instruction, and failed to preserve and raise the claim on direct appeal, (6) the trial court gave a defective reasonable doubt instruction and trial counsel ineffectively failed to timely object and otherwise preserve the claim for direct appeal, (7) due to the trial court's effort and counsel's ineffectiveness, Mr. Simpson waived his right to sever the penalty phase hearing from his co-defendant, (8) his counsel ineffectively failed to object to the trial court's instructions on the nature of aggravating and mitigating circumstances which prevented the jury from considering and giving full effect to the relevant mitigating evidence, (9) the trial court gave a preponderance of the evidence instruction which prevented the jury from considering relevant mitigating evidence, and his counsel failed to object to the instruction, (10) the jury was permitted to double count his one prior conviction to establish two distinct aggravating factors, and his counsel failed to object to the instant instruction, (11) the trial court's instruction on finding an aggravating circumstance of a significant history of felony convictions involving violence was constitutionally vague, and his counsel was ineffective for failing to object, (12) his counsel failed to object to the trial charge given and failed to request the jury be instructed that "life means life," (13) he was subject to substantial pre-arrest delay, and his counsel did not properly raise the issue, (14) his counsel failed to request and receive a cautionary instruction concerning the testimony of Tracena Copper, (15) his counsel failed to obtain a bench warrant for the appearance of Felicia Brokenborough and failed to move for the admission of her prior testimony and/or entire police statement, (16) his counsel failed to confront Ms. Washington concerning her relationship with Mr. Simpson and her motive to lie, (17) his counsel failed to call Mr. Thompson to testify about Ms. Washington's relationship with Mr. Simpson, her motivation to lie, and Mr. Simpson not having been in the car when it was searched by police at the Cheltenham Mall, (18) his PCRA counsel failed to permit Mr. Simpson to present expert testimony of Marc Bookman, and (19) his PCRA counsel abandoned a claim regarding an adverse inference instruction given during both the guilty and penalty phases of trial. Finally, Mr. Simpson also contends that habeas relief is warranted due to the cumulative effect of the errors described in his petition.

10

in part because his appellate counsel was ineffective in failing to raise a federal due process claim regarding the jury instructions. The Report and Recommendation was thereafter adopted.[6]

Taking notice of Magistrate Judge Lloret's Report and Recommendation, this Court ordered supplemental briefing on the issue of the allegedly defective jury instructions with respect to the specific intent charge. The Court also required the parties to address how Magistrate Judge Lloret's recommendations may apply to Mr. Simpson's case. It is on Mr. Simpson's federal due process claim with respect to the insufficiency of his vicarious jury instructions that the Court focuses its discussion today.

## DISCUSSION

### I.   Legal standard

"AEDPA's Section 2254(d) limits the ability of a federal court to grant habeas corpus relief to a petitioner based upon a federal constitutional claim that was 'adjudicated on the merits' in state court." *Bennett v. Superintendent Graterford SCI*, 886 F.3d 268, 281 (3d Cir. 2018) (citing 28 U.S.C. § 2254(d)). There are only two instances in which a federal court can grant a writ of habeas corpus on behalf of a person in state custody when that claim was adjudicated on the merits in state court. First, if the adjudication of the claim "resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States[.]" *Id.* at § 2254(d)(1). Second, if the adjudication of the claim "resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." *Id.* at § 2254(d)(2).

---

[6]     *See Bowers v. Wenerowicz*, No. 13-5550, 2017 WL 2981226 (E.D. Pa. July 12, 2017). Thereafter, the parties appealed, but reached an agreement, and the appeals case was dismissed.

"If a claim was not adjudicated on the merits in state court, [the court] review[s] legal questions and mixed questions of law and fact *de novo*." *Id.* (citing *Cone v. Bell*, 556 U.S. 449, 472 (2009)). In that case, the state court's factual determinations are presumed to be correct which may be rebutted by clear and convincing evidence. *Id.* at 282 (citing *Appel v. Horn*, 250 F.3d 203, 210 (2001)).

"As a general rule, federal courts may exercise the power to consider habeas applications only where 'it appears that the applicant has exhausted the remedies available in the courts of the State.'" *McCandless v. Vaughn*, 172 F.3d 255, 260 (3d Cir. 1999) (quoting *Walker v. Vaughn,* 53 F.3d 609, 614 (3d Cir.1995)). This "exhaustion rule" requires a petitioner to "fairly present" federal claims in state court before bringing them in federal court. *Id.* (citing *Duncan v. Henry,* 513 U.S. 364, 365 (1995); *Picard v. Connor,* 404 U.S. 270, 275 (1971); *Lambert v. Blackwell,* 134 F.3d 506, 513 (3d Cir. 1997)). "When a claim is not exhausted because it has not been 'fairly presented' to the state courts, but state procedural rules bar the applicant from seeking further relief in state courts, the exhaustion requirement is satisfied because there is 'an absence of available State corrective process.'" *Id.* (citing 28 U.S.C. § 2254(b)). In that case, a petitioner has procedurally defaulted his or her claims and the federal court may not consider the merits of the claim unless the petitioner "establishes 'cause and prejudice' or a 'fundamental miscarriage of justice' to excuse his or her default." *Id.* (citing *Coleman v. Thompson,* 501 U.S. 722, 750 (1991)).

Thus, the initial question before this Court is whether Mr. Simpson has exhausted his state court remedies on the federal due process claim related to the jury instructions. Because the claim has not been fashioned as an ineffectiveness claim, the Court must determine whether Mr. Simpson fairly presented his claim by way of his direct appeal. If he did not, the claim has not been properly exhausted.

12

If the claim has been fairly presented, which the Court determines it was under the applicable law, the Court next must address whether the state court addressed the claim on the merits to establish which standard of review to apply to Mr. Simpson's claim.

Underlying the Court's discussion in this Memorandum is the divergence of jury instruction law on the specific issue before the Court, in federal and state courts. A discussion of the varying standards is helpful in laying the groundwork for the Court's findings. Thus, the remainder of this Memorandum is outlined as follows. First, the Court discusses the actual jury instructions challenged in the underlying trial. Second, the Court addresses in detail the manner in which the applicable state and federal standards has developed over time with respect to the challenge at-hand (namely, to vague vicarious jury instructions). Third, the Court determines the preliminary question of whether Mr. Simpson has exhausted his federal due process claim. Lastly, the Court determines whether the specific jury instructions used at Mr. Simpson's trial relieved the Commonwealth of its burden of proving specific intent beyond a reasonable doubt, and if so, what prejudice that caused Mr. Simpson.

## II.    The jury instructions in the Simpson-Bowers trial

When charging the jury in the underlying trial that gave rise to the present federal habeas petition, the state court first gave some initial instructions for the jury to consider:

> Members of the jury, the Commonwealth's burden to prove a defendant guilty of every element of every crime is not diminished by the fact that in this case two defendants are being tried jointly. Each of them should be considered separately by you concerning their guilt or innocence and the evidence against each must be evaluated separately. . . .   Although the trial is based upon a particular incident, each defendant is on trial before you individually and is to be found guilty or not guilty based upon the evidence or lack of evidence as to him alone.
>
> Now, in these instructions, whether I say defendant or defendants, my instructions are applicable to both unless I otherwise specify. And sometimes I may refer to them collectively, but you should

know that I do not consider them collectively and I instruct you that
you must consider each separately and the evidence against each
separately.

12/16/97 Tr. at 6–7. Following some other introductory instructions, the court went on to give the

following instructions defining malice and first-degree murder:

> Malice is what distinguishes murder from other types of homicide.
> Therefore, to determine whether a homicide constitutes murder you
> must first determine whether malice was present. You must decide
> whether at the time of the killing the slayer was motivated by malice.
> That is, was there a particular hatred or ill will against a particular
> person, or was there a wickedness of disposition, a hardness of the
> heart, cruelty, recklessness of consequence, or a mind regardless of
> social duty. If there was no malice, there was no murder of any
> degree.
>
> Now, legal malice may be inferred and found from the attending
> circumstances. You may infer legal malice from the intentional use
> without legal excuse or legal justification of a deadly weapon on a
> vital part of another human body. If you find these defendants guilty
> of murder; that is, an unlawful killing with malice, you must then
> determine whether they are guilty of murder of the first degree,
> murder of the second degree or murder of the third degree.
>
> And I'm now going to define those various degrees of murder to
> you.
>
> Murder of the first degree is a criminal homicide committed with the
> specific intent to kill.
>
> Now, remember, each defendant is on trial individually and the
> evidence against each with respect to all charges, including first
> degree murder, must be considered separately.
>
> Again, murder of the first degree is a criminal homicide committed
> with a specific intent to kill. An intentional killing may be a killing
> by means of poison or by lying in wait, or any other kind of willful,
> deliberate and premeditated act.
>
> Therefore, in order to filed [sic] the defendant guilty of murder in
> the first degree, you must find that the defendant had the specific
> intent to kill and that the killing was a willful, deliberate and
> premeditated act.

14

Now, I will try to more specifically define these words.

If an intention to kill exists, then in the eyes of the law the killing is willful. If this intent is accompanied by such circumstances as evidence a mind fully conscious of its own purpose, it's deliberate. And if sufficient time has been afforded to enable the mind of the killer fully to frame the design to kill, and to select the instrument or to frame the plan to carry the design to execution, it is premeditated.

Now, although a defendant must premeditate in order to have a specific intent to kill, premeditation can be very brief. All that is necessary is that there be time enough so that the defendant has a fully formed intent to kill the victim and is conscious of that intention.

Now, if you believe that the defendants intentionally used a deadly weapon on a vital part of the victim's body, you may regard that as an item of circumstantial evidence from which you may infer that the defendants had the specific intent to kill.

Although the nature of the weapon used may be quite material in ascertaining whether there was or was not an intent to kill, that intent must still in every case be collected from all the attending circumstances no matter what may have been the instrument of death.

*Id.* at 12–16.

After instructing on second and third-degree murder, robbery, kidnapping, and possession of an instrument of crime, the court gave the following conspiracy instruction:

Now, members of the jury, in this case too, the defendants are charged with conspiracy. They're charged with conspiracy to shoot and rob the victim, and I already defined the crimes of murder and robbery which are the crimes which the defendant—which the defendants allegedly conspired to commit.

In order to find the defendants guilty of conspiracy, you must be satisfied initially that the following two elements of the conspiracy have been proved beyond a reasonable doubt: First, that the defendants agreed with each other or another person or persons that they engage in conduct which constitutes the crimes of robbery, and/or murder, or agreed to aid each other or another person or persons in the planning or commission of the crimes of robbery or

15

murder. And second, that the defendants did so with the intent of promoting or facilitating commission of these crimes.

No person may be convicted of conspiracy unless an overt act done in pursuance of the conspiracy is alleged and proven to have been done by him or a person with whom he conspired.

Now, in this case, it is alleged that the overt act is to rob, shoot *and* kill Andrew Haynes, and thus you cannot find the defendants guilty unless in addition to the two elements of the crime you are satisfied beyond a reasonable doubt that the defendants or a person with whom they conspired did the alleged overt act in pursuance of the conspiracy.

Now, members of the jury, a conspiracy requires an agreement between two or more persons. And the agreement may be a formal or explicit agreement but it does not have to be. It is not necessary that the parties meet together and state in words or writing what the scheme is or how it is to be carried out.

The agreement may be in whole or in parted [sic] a tacit unspoken agreement. A conspiracy may be proved by circumstantial evidence as well as by direct evidence. The existence of a conspiracy may in a proper case be inferred from the relation, conduct, or circumstances of the parties.

It is not necessary that the crime which is the object of a conspiracy be committed or even attempted. This is because the essence of the crime of conspiracy is the agreement. However, it is necessary that at least one of the parties do something more than merely conspires. After the conspiracy comes into existence he must perform an overt act in pursuance of the conspiracy. All that is required is that the party who performs the overt act do it in pursuance of the conspiracy.

Now, members of the jury, after considering all of the evidence [sic] you find that the Commonwealth has established beyond a reasonable doubt each of the elements of the crime of conspiracy, and that a particular overt act was done in pursuance and in furtherance of the conspiracy, by the defendants or their accomplice or conconspirator [sic], you should find the defendant guilty of these charges. Otherwise you must find the defendants not guilty.

Now, I do notice that sometimes I say defendant or defendants, and again, I want to repeat to you that my instructions apply to both and

> I consider them individually and separately and you must do the same.

*Id.* at 28–32.   Next, after speaking briefly about motive, the court instructed on accomplice liability:

> A defendant is guilty of a crime if he is an accomplice of another person or persons who commits these crimes.  A defendant does not become an accomplice merely by being present at the scene or knowing about the crimes.  The Commonwealth has the burden not simply to show the defendants present at the scene but to show that the defendant was an active partner of the actual perpetrator or perpetrators.
>
> He is an accomplice if with the intent of promotion or facilitating commission of the crime, he solicits, commands, encourages or requests the other person to commit it, or aids, agrees to aid or attempts to aid the other person or persons in planning or committing the crimes.
>
> However, a defendant is not an accomplice if before the other person commits the crime he stops his own efforts to promote or facilitate the commission of the crime and wholly deprives his previous efforts of effectiveness, or if he gives timely warning to law enforcement authorities or otherwise makes a proper effort to prevent commission of the crime.
>
> Now, you may find a defendant guilty of crimes on the theory that he was an accomplice as long as you're satisfied beyond a reasonable doubt that the crime was committed, that the defendant was an accomplice of the person or persons who committed it.  It does not matter that another person or persons who you believe committed the crime has not been prosecuted or convicted or has been convicted of crime or has an immunity from prosecution or anything else.

*Id.* at 33–35.  The court then turned to liability for a co-conspirator's crime:

> Now, members of the jury, further a defendant may by reason of being a member of a conspiracy become liable for a crime he did not personally commit.  To become liable as a coconspirator, although it is not necessary that the defendant be present at the scene, again, mere presence and knowledge of the proposed crime are not alone sufficient to show a defendant's participation as a coconspirator. You may find the defendant guilty of the crimes charged as a

> conspirator if you're satisfied beyond a reasonable doubt first, that
> the defendant agreed with another person or persons that they or one
> of them would commit these crimes; and second, that the defendant
> so agreed with the intent of promoting or facilitating the commission
> of these crimes; and third, that while the agreement remained in
> effect, the crimes were committed by the defendant or that other
> person or persons; and fourth, that the crimes were committed by
> the defendant or that other person or persons, or in this case it would
> be by that other person or persons in furtherance of the Defendant's
> and his—that's the other person's common design.

*Id.* at 35–36.

At the end of the charge both defense attorneys objected to the accomplice instruction, and

Mr. Bowers's attorney requested a supplemental instruction informing the jury that intent cannot

be shared. The Commonwealth objected to the supplemental instruction. The trial judge declined

to give the requested supplemental instruction. The trial court also reiterated the jury instructions

for first-degree murder after a jury question seeking clarification of the various degrees of murder.

*See Simpson,* 754 A.2d at 1275 n. 17.

## III.   The relevant state and federal divide on alleged due process violations caused by conspiracy and accomplice jury instructions.

The Pennsylvania and federal standards on jury instructions differ, and for Mr. Simpson's

case, in a determinative way. *See Bowers*, 2016 WL 9306253, *22–30. Notably, as the Court will

address in detail, the state supreme court determined under state law that Mr. Simpson was not

entitled to post-conviction relief on his underlying claim. But, application of the federal standard

comes out the other way.

Jury instructions in cases involving first-degree murder and a conspiracy or accomplice

liability can meet Pennsylvania state standards but fail to meet federal due process standards. In

Pennsylvania, first-degree murder requires a finding that the defendant possessed a specific intent

to kill. Indeed, it is this intent that separates first-degree murder from other types of homicide, and

18

supports the death penalty for that crime. As a general matter, a defendant can be convicted of conspiracy or accomplice liability so long as one of his or her co-conspirators possessed the requisite *mens rea*. But the general conspiracy rules do not apply to first-degree murder. That is, under Pennsylvania state law, a defendant can only be found vicariously liable for the substantive crime of first-degree murder if he harbors the specific intent to kill. But, in some cases involving first-degree murder and vicarious liability charges, Pennsylvania courts have not clarified that a defendant cannot be convicted of first-degree murder unless he himself possessed the specific intent to kill. Which is to say, that the defendant cannot be convicted based solely on the fact that an accomplice or a co-conspirator possessed a specific intent to kill. When the instructions are ambiguous on this point, the vagueness can potentially relieve the Commonwealth of its burden of proving an element of first-degree murder, to wit, the specific intent to kill, beyond a reasonable doubt.

Over the past two decades, a divide has developed between state and federal case law on this issue. The contrast between the state and federal standards has caused the current Chief Justice of the Pennsylvania Supreme Court to opine that "unless and until the relevant state/federal divide is addressed by the United States Supreme Court, the issuance of unqualified accomplice liability instructions in first-degree murder cases in the Pennsylvania courts risks a needless waste of untold resources on the part of the Commonwealth, defense attorneys, and the courts." *Commonwealth v. Sepulveda*, 55 A.3d 1108, 1158 (2012) (concurrence). Thus, the discrepancy has philosophical and practical ramifications, not the least of which are visited upon the defendants who find themselves in the gap.

     a.  Pennsylvania Supreme Court cases

A summary of the Pennsylvania Supreme Court's jurisprudence on the present issue begins with *Commonwealth v. Huffman*, 638 A.2d 961 (Pa. 1994). In that case, two defendants conspired

to rob the place of employment of one of the defendants. One or both of the defendants beat and killed the victim. As a result, the appellant was convicted of first-degree murder, robbery, burglary, and conspiracy. The appellant had argued that as a matter of law, the trial court's instruction on accomplice liability was improper. The Pennsylvania Supreme Court agreed, noting that the relevant jury instruction allowed the jury to convict the petitioner of first-degree murder without finding he had possessed a specific intent to kill. *Id.* The jury instruction in *Huffman* as to co-conspirator and accomplice liability provided:

> Thus, in order to find a Defendant guilty of murder in the first degree, you must find that the Defendant caused the death of another person, or that an accomplice or co-conspirator caused the death of another person. That is, you must find that the Defendant's act or the act of an accomplice or co-conspirator is the legal cause of death of [the victim], and thereafter you must determine if the killing was intentional.

*Id.* at 962 (alteration in original).

In noting that this charge was "a patently erroneous statement of the law[,]" the court likened the inaccurate jury instruction on vicarious liability to be "no less questionable" as an inaccurate instruction on the burden of proof that the state supreme court had previously held to have caused another petitioner prejudice. *Id.* at 963 (citing *Commonwealth v. Wortham*, 369 A.2d 1287 (1977)). The court then found, "[u]nder the contested instruction, the jury needed to find only that the appellant had conspired to commit or assisted in a burglary with the actual murderer in order to find him guilty. Permitting such a faulty verdict would be to tolerate a miscarriage of justice. The Commonwealth must prove all of the elements of a crime beyond a reasonable doubt." *Huffman*, 638 A.2d at 201 (citing *In re Winship*, 397 U.S. 358 (1970)).

Two years later, the state supreme court decided *Commonwealth v. Thompson*, 674 A.2d 217 (Pa. 1996). Mr. Thompson had handed his co-defendant a gun, and the co-defendant shot the victim. As a result, Mr. Thompson was convicted of first-degree murder, aggravated assault,

possession of an instrument of crime, and two counts of criminal conspiracy. *Id.* at 218. He contended that counsel was ineffective for not challenging jury instructions that allowed the jury to convict him of first-degree murder without finding that he had the specific intent to kill. *Id.* at 222. The court first found the appellant's reliance on *Huffman* misplaced and the case distinguishable. The court determined that in *Huffman*, the applicable jury instruction had involved an incorrect statement of the law. By contrast, in Mr. Thompson's case, the "charge as given . . . adequately and correctly established the requirements which the jury must find in order to render a verdict on the issue of accomplice liability for first degree murder." *Id.* at 223. In particular, the court concluded that the charge correctly defined first-degree murder, including specific intent, and was followed by an accurate description of accomplice liability. *Id.* The court likened the case to *Commonwealth v. Chester*, 587 A.2d 1367 (Pa. 1991), where the state supreme court had determined the charge given was adequate. The state court also noted that the appellant's reading of *Huffman* as "requiring that the legal concepts of accomplice liability and first degree murder be revealed to the jury by a set pattern of magical words" was incorrect. *Id.*

In *Commonwealth v. Chester,* the police responded to a report of a car fire. After a search of the area near the location of the car, police discovered a dead body, which was mutilated, and the victim's throat slashed repeatedly. As a result of this death, appellant and his co-conspirator were convicted of first-degree murder, kidnapping, aggravated assault, unlawful restraint, false imprisonment, conspiracy, and possession of an instrument of crime. At the appeal, appellant challenged the jury instructions on accomplice liability, and specifically that counsel was ineffective for failing to object to the trial court's failure to instruct the jury on specific intent with respect to accomplice liability. The trial court had provided the following jury instructions:

> A person is guilty of a particular crime if he is an accomplice of
> another person who commits that crime. A defendant does not

21

become an accomplice merely by being present at the same scene or knowing about a crime. *He is an accomplice,* however, *if with the intent of promoting or facilitating commission of a crime he solicits, or commands or encourages or requests the other person to commit it or if he aids, agrees to aid or attempts to aid the other person in planning the crime or committing the crime. However, a defendant is not an accomplice* under this concept that I'm explaining to you *if before the other person commits the crime he stops his own efforts to promote or facilitate the commission of the crime.* You may find the defendant guilty of a particular crime on the theory that he was an accomplice so long as you are satisfied beyond a reasonable doubt that the crime was committed and the defendant was an accomplice of the person who committed it. All right. That is the accomplice theory of liability.

587 A.2d at 1385 (emphasis in original).

The supreme court determined the relevant jury instructions on accomplice liability passed muster because they mirrored the statute defining accomplice liability. Moreover, in addition to describing accomplice liability, the trial court separately had explained the requirements of a first-degree murder and instructed the jury on specific intent to kill. According to the *Chester* Court, "[c]learly the jury was guided as to the mental state required for accomplice liability[;]" thus, trial counsel was not ineffective for failing to make an objection to these jury instructions. *Id.*

In *Commonwealth v. Wayne*, 720 A.2d 456 (Pa. 1998), the defendant had been convicted of first-degree murder, conspiracy to kill, and possession of an instrument of crime. Mr. Wayne was charged with murder as either a co-conspirator or accomplice, and the trial court gave the following instructions on accomplice and co-conspirator liability:

Now, with regard to a state of mind, mental state of the person who is charged with a crime as an accomplice, when we get to homicide, the person that may be guilty as an accomplice, you have to look at his state of mind to see whether he had the necessary intent to kill or intent to cause harm. And this required mental state must be proven beyond a reasonable doubt to be one which the accomplice had in his mind and can't depend on proof of intent to kill only as the principal party.

Now, with regard to co-conspirator, someone is liable even though he [sic] was the conspirator who had the state of mind as necessary. The person is guilty as a co-conspirator doesn't have to have the same state of mind.

In other words, two people conspire to kill someone, the person who pulls the trigger may have the intent to kill. It doesn't matter whether the co-conspirator had it in his mind or not. He's responsible. When it comes to liability as an accomplice, the person who is the accomplice has to have in his mind the required mental state. And I'm going to talk about certain mental states in a few minutes, malice, intent and so on. Keep this in mind.

Now, there, you have the mental states such as malice and intent, such as intent to kill, or liability as an accomplice, that is, someone who went along and accompanied and either aided or helped or solicited or whatever. As I mentioned before, you have to look at the mental state of the accomplice; in other words, the person pulling the trigger might have a certain mental state indicating malice or intent to kill. But for first degree you have to find that in the accomplice, also, in his mind. So you have to say the accomplice had the intent to kill or malice for first degree or malice and the intent to cause serious bodily harm for third degree.

Now with regard to a co-conspirator liability there is a little difference. What I said to you earlier is—I believe I covered it and I want to make sure I do it clearly—a person can be liable as a co-conspirator if someone else in the conspiracy commits the killing. You can still be liable. The defendant could still be found liable if you so choose as a co-conspirator. But here you look to the mental state of the principal.

In other words, if one is liable as a co-conspirator, you don't look at mental state. You look at the mental state of the person who pulled the trigger. If the person who pulled the trigger had the malice and the intent to either kill or cause serious bodily harm, then the co-conspirator would be liable even if he didn't have that particular mental state, himself. There's a big difference.

An accomplice has to have this mental state in his own mind. The co-conspirator is responsible for the mental state from the person who actually pulled the trigger.

*Id.* at 463.

Mr. Wayne argued that his counsel was ineffective for failing to object to the jury instructions that instructed on co-conspirator liability as to first-degree murder. *Id.* at 462. The Pennsylvania Supreme Court found that the jury instructions were similar to *Huffman*, and in finding that the appellant's ineffectiveness claim was meritorious, the court stated "simple application of the co-conspirator rule to cases of first-degree murder would alleviate the Commonwealth's burden of proving an essential element of the crime." *Id.* at 464. The court continued "[i]f the general rule of co-conspirator liability applied to eliminate the need to establish the existence of specific intent, then an accused conspirator could be culpable for first-degree murder without proof that the accused shared the *specific intent to* kill[.]" *Id.* According to the state court, not only would that result violate the intent of the legislature in delineating the specific elements of the various degrees of homicide, but such a result would be inconsistent "with the legal principles outlined in . . . *Huffman*[.]" *Id.* at 464. To allow such a conviction to stand, without proof beyond a reasonable doubt showing that an accused actually embodied the specific intent to kill, "would be unconscionable." *Id.*

Ultimately, however, the court concluded that the error in the jury instructions was harmless. The court determined that when analyzing the instructions as a whole, and noting that the conspiracy at issue was a conspiracy to kill, a "conspiracy to kill presupposes the deliberate premeditated *shared specific* intent to commit murder." *Id.* at 465 (citing *Commonwealth v. Rios*, 684 A.2d 1025 (Pa. 1996)) (emphasis in original). The court determined:

> Unlike the situation in *Huffman*, it cannot be said that this verdict was reached through speculation as to the nature of the conspiracy and the role of the conspirators. . . . the conspiracy was a conspiracy to kill. The conspiracy had only one object, the deliberate decision to take a life. Once this jury determined that appellant was guilty of conspiracy, given the sole object of that conspiracy, the only logical conclusion to reach is that this jury also determined, beyond a reasonable doubt, that appellant possessed the specific intent to kill.

24

*Id.*

In Mr. Simpson's case, *Commonwealth v. Simpson*, 754 A.2d 1264, as already noted, the state supreme court rejected the contention that the vicarious liability jury instructions in Mr. Simpson's trial were similar to those used in *Huffman*. It also determined that the instructions met the jurisprudence set forth in *Wayne*.

In finding that the jury instructions on accomplice and conspiratorial liability were not so vague as to permit the jury to convict Mr. Simpson of first-degree murder by alleviating the Commonwealth's burden of proving specific intent, the state court determined that when assessed as a whole, the instructions "coherently and unambiguously informed the jury that the Commonwealth needed to prove beyond a reasonable doubt that [Mr. Simpson] maintained the individual specific intent to kill the victim to support a finding of first-degree murder." *Id.* at 1275. In other words, where the jury instructions on first-degree murder were given before the instructions on accomplice and conspiratorial liability, the trial judge did not err.

Specifically, the court found the instructions consistent with the court's decision in *Wayne*, noting:

> Against the backdrop of [the] clear charge to the jury regarding the requisite mental state for first-degree murder . . . the [trial] court further instructed the jury regarding the principles of accomplice and conspiratorial liability. In reviewing the instructions of the trial court as to accomplice and conspiratorial liability, nothing in the language of those instructions undermined the clear charge regarding the specific intent element of first-degree murder. Additionally, when the jury requested that the trial court elucidate the definitions of the various degrees of murder, the trial court reiterated to the jury that 'in order to find the defendants guilty of murder in the first degree, you must find that the particular defendant had the specific intent to kill.' (N.T. 12/16/97, p. 80). Although [Mr. Simpson] premises his argument on the contrary, the trial court is not required to deliver its instructions regarding first-degree murder and those regarding accomplice and conspiratorial

> liability in a prescribed manner. *Commonwealth v. Thompson,* 543
> Pa. 634, 674 A.2d 217, 222–23 (1996). The sole requirement is that
> the instructions properly and adequately assess the law. *Id.* In
> digesting this issue, we believe that the jury instructions, viewed in
> their entirety, adequately apprised the jury that [Mr. Simpson] could
> only be convicted of first-degree murder if he harbored the specific
> intent to take the victim's life.

*Id.* at 1275-77.[7]

In rejecting Mr. Simpson's reliance on *Huffman*, the court remained "unconvinced"

because "the trial court . . . communicated to the jury that [Mr. Simpson] had to maintain his own

specific intent to kill in order to support a finding of first-degree murder." *Id.* at 1276. It continued

that the court's later instructions pertaining to accomplice and conspiratorial liability did not detract

from this clear message. The court also determined, "contrary to [Mr. Simpson's] attempts to

couple the jury instructions in *Huffman* with those given here, the jury instructions given in the

present case" are like those "already validated by this Court in other cases." *Id.* The court then

cited its decisions in *Commonwealth v. Thompson, supra,* 674 A.2d at 222–23 (stating charge

"adequately and correctly established the requirements which the jury must find in order to render

a verdict on the issue of accomplice liability for first degree murder") and *Commonwealth v.*

*Chester,* 587 A.2d at 1384–85 (holding accomplice liability instruction sufficient when trial court

separately explained to jury that specific intent to kill must be found to support first-degree murder

conviction).

---

[7]       It is quite curious that the Pennsylvania Supreme Court stated, "[a]fter reviewing the instructions
given to the jury, we find that they were consistent with our decision in *Wayne* and like the jury
instructions previously validated by this Court." *Simpson,* 754 A.2d at 1276–77. As Magistrate Judge
Lloret presciently noted, *see Bowers,* 2016 WL 9306253, *25 n.36, it is hard to fathom how Mr. Simpson's
case can be compared to *Wayne*. First, the jury instructions in *Wayne* were deficient. Second, Mr. Simpson
was convicted of a multi-object conspiracy to rob and kill. In *Wayne*, the defendant was convicted of a
single object conspiracy to kill, which led the court to conclude that erroneous jury instructions were
harmless because the jury must have concluded that the petitioner had the specific intent to kill. The saving
grace of *Wayne*, a single object conspiracy, was not present in Mr. Simpson's case, so it is difficult to see
how the court could compare the two.

These cases show that under its current jurisprudence, the Pennsylvania Supreme Court has continued to hold that when read as a whole, jury instructions are valid so long as specific intent for first-degree murder is properly defined somewhere in the instructions and conspiracy or accomplice liability is properly defined elsewhere, even if the instructions are somewhat otherwise ambiguous, or verbose to the point of being impossible to discern, as to whether a conspirator or accomplice must harbor specific intent to kill. *See also Commonwealth v. Speight*, 854 A.2d 450 (Pa. 2004); *Commonwealth v. Bennett*, 57 A.3d 1185 (Pa. 2012) (affirming first-degree murder conviction and finding a conspiracy charge where the conspiracy had multiple objects adequate when the trial court instructed "[w]here two or more join in the commission of an unjustified assault which results fatally, all are guilty regardless of which one inflicts the mortal wounds. When two or more combine to commit a felony or to make an assault, and in carrying out the common purpose another is killed, the one who enters into the combination but does not personally commit the wrongful act is equally responsible for the homicide as the one who directly causes it."). Indeed, in a concurrence in *Sepulveda,* Chief Justice Saylor posed that *Huffman* has been effectively overruled. *Sepulveda*, 55 A.3d at 1158; *see also Commonwealth v. Maisonet*, 31 A.3d 698, 694 n. 2 (2011) (*Huffman* has been "effectively overruled").

   b.   Third Circuit cases

   The Court of Appeals of this circuit has taken a different path to determine otherwise, finding jury instructions that conflate the specific intent requirement and fail to differentiate each defendant's specific intent in a conspiracy to be invalid.

   In *Smith v. Horn*, 120 F.3d 400 (1997), the court concluded that a petitioner was entitled to federal habeas relief under the following fact pattern. The petitioner had entered a pharmacy with an accomplice with the intention of robbing it and, in doing so, the victim was shot and killed. While "there was evidence that both [the accomplice and the petitioner] carried handguns that day,

the evidence tended to show that Smith actually committed the killing." *Id.* at 404. Of relevance, the petitioner was convicted of first-degree murder and conspiracy to commit murder, not conspiracy to commit first-degree murder. *Id.* at 406. Mr. Smith was then sentenced to death.

The jury instructions given at trial with respect to accomplice conduct read:

> [I]f ... you find that Smith and Alston were accomplices of each other, then it is not important for you to determine which one actually pulled the trigger that brought about the killing of Richard Sharp, *if you find beyond a reasonable doubt that one of the two did so and were [sic] acting as the accomplice of each other at the time.* In order, however, to find Clifford Smith to be guilty, you need not conclude, as I said, that he was the actor; that is, if I can use the word "shooter," but he was, nevertheless, *acting as an accomplice of Alston* and it was his intent of promoting or facilitating that act and the killing was done in furtherance of the robberies, if you so find, then he would be guilty as though he were the actual perpetrator....

> ... [T]he Commonwealth must prove all of the elements of the case beyond a reasonable doubt, but they do not have to prove beyond a reasonable doubt which of the two, Smith or Alston, actually brought about the killing of Richard Sharp by showing who pulled the trigger and placing [sic] the shot in his head. *If, and I emphasize this, you find that one was the accomplice of the other and that one of the two actually performed the killing, you, the jurors, need not agree on the role or roles played by the respective parties; that is, by this defendant and his accomplice, if you find that that was the position of both, provided that each of you is satisfied that the crime was actually perpetrated by the defendant or by the accomplice of the defendant.* Conversely, if you find that one was not the accomplice of the other but that a criminal homicide occurred, then you must determine who performed the act of killing and, of course, it follows that if Alston was the killer and Smith was not his accomplice, he, Smith, would not be guilty of the crime of murder for the Commonwealth has not proven this accomplice theory beyond a reasonable doubt.

*Id.* at 405 (emphasis in original). The trial court then instructed the jury on first-degree murder:

> [T]he elements of first degree murder are the unlawful killing of another person done intentionally; that is, willfully, deliberately and with premeditation, plus malice, as I will define that term to you. *If these elements have been established beyond a reasonable doubt,*

> *you may, on the theory that one was the perpetrator and the other the accomplice, find Clifford Smith guilty of murder in the first degree ....*

*Id.* (emphasis in original).

Thereafter, the trial court provided the conspiracy charges, which the appellate court noted made no reference to a specific substantive crime:

> You should ... determine ... *whether there was the requisite intent to enter into this conspiracy to commit the robbery and the killing which the Commonwealth contends flowed therefrom or whether there was the requisite intent to enter in and be the accomplice with the other in bringing this about.* That is to say, *did Clifford Smith agree,* although not necessarily by words, but by conduct and circumstances *to bring about this robbery which, in turn, led to the ultimate shooting,* so the Commonwealth contends, and the killing of Richard Sharp? *If so, then the major basis of conspiratorial liability exists as to him.*

*Id.* at 406 (emphasis in original).

The federal court agreed with Mr. Smith's argument that the jury was improperly instructed that if it found beyond a reasonable doubt that one of the men had the specific intent to kill, and that Mr. Smith intended to conspire in the robbery, this finding would be adequate to convict Mr. Smith of first-degree murder, even if he did not harbor the specific intent necessary. The court determined this error to be of a federal constitutional nature. It found certain portions of the jury instructions were ambiguous "as to the requisite finding of intent[, and] other portions affirmatively inform[ed] the jury that it need *not* find beyond a reasonable doubt that [Mr.] Smith specifically intended that the victim die in order for Smith to be guilty of murder in the first degree." *Id.* at 411. The court took exception to the accomplice discussion that the instructions did not clarify whether accomplice meant accomplice in the killing, the robbery, or both. *Id.* at 412. According to the court, "[t]he charge . . . blurred the distinction between 'accomplice in the robbery' and 'accomplice in the killing,' leading the jury to believe that an accomplice for one

29

purpose is an accomplice for all purposes." *Id.* With respect to the conspiracy charge, the court found the instruction unclear as to whether one could have the intent to enter into a conspiracy to commit robbery in order to then be found liable for the killing that flowed from the robbery. The court explained the conflation of the two independent requirements of intent "was aggravated by the court's next instruction that the jury determine 'whether there was the requisite intent to enter into and be the accomplice with the other in bringing *this* about," without specifying what "this" meant. *Id.* at 413. The federal court determined that in misapplying its own law, Pennsylvania created a federal constitutional violation because the jury instructions removed the "Commonwealth's burden of proving beyond a reasonable doubt one of the essential elements of the crime of first-degree murder." *Id.* at 414. The Court also determined the error was not harmless.

In *Bronshtein v. Horn*, 404 F.3d 700 (3d Cir. 2005), the defendant was found guilty of first-degree murder, robbery, theft of movable property, possession of an instrument of crime, and conspiracy to commit murder. *Id.* at 704. The murder occurred during a robbery of a jewelry store. *Id.* The Court of Appeals for the Third Circuit reviewed the instructions *de novo*. *Id.* at 710 n.4. The court found that the conspiracy "instructions regarding the first[-]degree murder charge were such that the jury could have convicted him of this charge without finding that he had a specific intent to kill" the victim. *Id.* at 710. That is, "the jury could find Bronshtein guilty of first-degree murder if it found that he had conspired to commit the robbery and that another conspirator had killed Gutman in furtherance of the robbery." *Id.* at 711.

However, because he was found guilty of conspiracy to commit murder, it was clear that the jury had found that the petitioner possessed the requisite specific intent and, thus, the error was harmless. The court determined the error was harmless because "the jury must have found that

Bronshtein participated in 'the planning or the commission of the crime of murder' and that he 'did so with the intent of promoting or facilitating the commission of the crime of murder.'" *Id.* at 714. Distinguishing *Smith v. Horn*, *supra*, the court found in *Smith,* it was "reasonably likely that the jury did not find that the defendant had the intent to enter into a conspiracy to commit murder, i.e., a specific intent to kill." *Id.* at 715. Moreover, the federal court noted that the trial court provided supplemental instructions to the jury on conspiracy to murder during deliberations, that clarified that to convict on murder via conspiracy liability, the conspirator needed to conspire to commit murder.

In the same year, the federal court decided *Laird v. Horn*, 414 F.3d 419 (3d Cir. 2005). There, the petitioner and an accomplice had left a bar with the victim, and the victim was later found brutally murdered. *Id.* at 422. The petitioner was convicted of a number of crimes including first, second, and third-degree murder, conspiracy, kidnapping, aggravated assault, unlawful restraint, false imprisonment, and possession of an instrument of crime.

The Court of Appeals for the Third Circuit affirmed the district court's finding that the accomplice instruction at the petitioner's trial created confusion around the specific intent required for first-degree murder. *Id.* at 425. At trial, the co-defendants both took the stand and admitted to being present when the victim was killed, but both denied intending to kill the victim and that the other defendant had been the one to inflict the fatal blow. Reviewing the case *de novo*, the court concluded that the instructions were similar to those in *Smith*, *supra*, 120 F.3d 400 and were "erroneous." *Id.* at 427–28. The appellate court determined "[g]iven the court's instruction on accomplice liability, the jury could easily have convicted Laird of first-degree murder based on him conspiring with Chester to kidnap or assault Milano even if jurors were not convinced beyond a reasonable doubt that Laird intended to kill him." *Id.* at 427.

31

With respect to harmless error, although the Commonwealth argued that any error was harmless because the petitioner was also convicted of a conspiracy to commit murder, the court found this argument unavailing because the petitioner was not convicted of conspiracy to commit *first-degree* murder. *Id.* at 428. Rather, the court noted "the jury might have believed that Laird intended to kidnap and/or assault Milano, but that only Chester intended to kill him. Such a finding would have supported a conviction for second-degree murder under Pennsylvania's felony murder rule, but it would not support a finding of that shared specific intent necessary to convict Laird of conspiracy to commit first-degree murder." *Id.*

The appellate court also highlighted an instruction that exacerbated the problem: "the particular crime, while it may *differ from the agreed crime,* was committed by the coconspirator in furtherance of his and the defendant's common design." *Id.* According to the court, "the conspiracy instruction clearly allowed the jury to convict for first-degree murder without a finding that each conspirator had the specific intent to kill as long as the killing was 'in furtherance' of the kidnaping or assault Laird had been charged with." *Id.*

Finally, the Court also rejected the Commonwealth's argument that the trial evidence overwhelmingly established that Mr. Laird had intentionally killed the victim. It noted that although there was evidence to support such a position, the court could not substitute itself for the jury and speculate about what portion of the testimony the jury believed. *Id.* at 429. For these reasons, the court determined the district court correctly held the accomplice instruction presented grave doubt as to whether the instructions as a whole adequately explained that the killer's coconspirator also must have intended to kill the victim.

Finally, in *Bennett v. Superintendent Graterford SCI*, 886 F.3d 268 (3d Cir. 2018), Bennett was charged on murder, criminal conspiracy, possession of an instrument of crime, and robbery.

32

The trial court instructed the jury on first, second, and third-degree murder, as well as voluntary manslaughter. The court also instructed the jury on conspiracy generally, and that the objectives of the conspiracy were murder, robbery, possession of an instrument of crime, and a firearms offense. *Id.* at 273. At trial, the Commonwealth never argued that Mr. Bennett had the specific intent to kill. Rather, it based the defendant's liability for first-degree murder on the basis that he was an accomplice or conspirator.

> With respect to conspiracy, the trial court instructed the jury as follows:
>
>> Where two or more join in the commission of an unjustified assault which results fatally, *all are guilty* regardless of which one inflicts the mortal wounds. When two or more combine to commit a felony or to make an assault, and in carrying out the common purpose another is killed, the one who enters into the combination but does not personally commit the wrongful act *is equally responsible for the homicide* as the one who directly causes it.
>>
>> ...
>> Such responsibility ... extend[s] even to a homicide which is the consequence of the natural and probable execution of the conspiracy *even though such homicide is not specifically contemplated by the parties*.

*Id.* at 274. The trial court also provided the following instructions on accomplice liability: "[One may be legally accountable for conduct of another not only if he is a coconspirator, but also if he is an accomplice who aids and abets the commission of a crime. . . . The degree of concern or collusion between parties to an illegal transaction means *the act of one is the act of all*." *Id.* at 275. These charges related to murder and manslaughter were given after the vicarious liability charges. Ultimately, the jury convicted Mr. Bennett of first-degree murder, conspiracy, possession of an instrument of crime, and robbery. Mr. Bennett was sentenced to life without parole.

Addressing the federal due process claim *de novo*, and upon reviewing the jury instructions under the applicable federal standard, the court of appeals determined there was a reasonable likelihood that the jury applied the vicarious liability instructions in a way that relieved the

Commonwealth from its burden of proving specific intent. The appellate court noted that the trial evidence showed the petitioner had supplied the loaded gun to rob the jewelry store, and he was sitting in the passenger seat of the getaway car during the robbery and shooting of the store clerk. However, there was a reasonable likelihood that the jury could have convicted Mr. Bennett of first-degree murder on the basis that he participated in the robbery, but not based on his actual specific intent to kill. *Id.* at 286-87.

The court reached this holding in light of all of the jury instructions as well, including the first-degree murder charges that it assumed to be correctly provided. *Id.* at 287. It stated "[t]he first-degree charge, at the most, contradicted the erroneous conspiracy and accomplice liability instructions," but a contradiction alone cannot cure a constitutionally infirm instruction. *Id.* This is because a reviewing court has no way of knowing which of the two irreconcilable instructions a jury ultimately used in reaching their verdict. The court also determined the error was not harmless, first on the basis that the Commonwealth had waived the argument, and second, because the trial evidence established that Mr. Bennett had conspired to commit armed robbery, and the Commonwealth only sought to hold Mr. Bennett liable for first-degree murder on the basis that he was an accomplice or conspirator.

c. Magistrate Judge Lloret's Report & Recommendation in Mr. Bowers's case

Finally, the Court also details the relevant determinations made by Magistrate Judge Lloret in his recommendations in the co-conspirator, Mr. Bowers's case. As noted, on September 30, 2016, Magistrate Judge Lloret issued a comprehensive Report and Recommendation on the habeas petition for Mr. Simpson's co-defendant, Malik Bowers. Mr. Bowers was sentenced to life in prison for his involvement in Mr. Haynes's kidnapping and murder. Ultimately, Magistrate Judge Lloret found that the jury instructions themselves were deficient, and he concluded Mr. Bowers was entitled to habeas relief because his appellate counsel was ineffective in failing to raise a

federal due process error regarding the jury instructions. In his recommendations, Magistrate Judge Lloret also noted the discrepancy between state and federal law on the exact issue before this Court. He determined that although the Pennsylvania Supreme Court found that the instructions were valid under Pennsylvania law, they fell short of the federal standard. This was so, even though Magistrate Judge Lloret found that while the trial judge initially made clear that a defendant could only be convicted of first-degree murder after the jury found he had the specific intent to kill, "[t]he instructions became problematic when they turned to co-conspirator and accomplice liability." *Bowers*, 2016 WL 9306253, at \*16.

Magistrate Judge Llloret found that the language related to the conspiracy charge was problematic language because the charge included a reference to "these crimes" which referred either to robbery or murder in the conspiracy charge. "[A] jury could reasonably understand the instruction to mean that if Bowers conspired to commit robbery, he could be held liable if Simpson committed murder." *Id.* at \*18. That is, Magistrate Judge Lloret concluded that because the conspiracy was described to the jury as a multiple-object conspiracy related to shooting and robbing, the jury instructions blurred the distinction between a conspiracy to rob, and one to kill.

The instructions, moreover, did not clarify whether "accomplice" meant accomplice in the killing, the robbery, or both. Again, within the jury instruction on accomplice liability, the trial judge repeatedly referred to "these crimes" without distinguishing the specific crimes themselves. According to Magistrate Judge Lloret, a jury "carefully following [the accomplice liability] instruction could reasonably have concluded that Bowers was guilty of 'a crime' (murder) because he was an accomplice of Simpson in the commission of 'these crimes' [*murder or robbery*]. *Id.* (emphasis in original); *see id.*, at \*30 ("[T]he accomplice and conspiracy instructions blurred the distinction between a conspiracy to rob, and one to kill. Like the instructions given in *Smith*, the

35

instructions here 'did not clarify whether accomplice means accomplice in both killing, accomplice in the robbery, or both. The charge thus blurred the distinction between accomplice in the robbery and accomplice in the killing, leading the jury to believe that an accomplice for one purpose is an accomplice for both.'") (citing *Smith*, *supra*, 120 F.3d at 412).

In sum, the instructions failed to carefully and clearly instruct that each individual had to possess the requisite intent to be convicted of first-degree murder, and that intent could not be shared by conspirators.

**IV.    Mr. Simpson's federal due process claim**

This discussion now brings us to the issue upon which Mr. Simpson's habeas petition turns.

Mr. Simpson contends that his federal due process rights were violated by the ambiguous vicarious jury instructions given at his trial. *See* Simpson Amended Petition, p. 28 ("Petitioner was deprived of due process of law under the Fifth and Fourteenth Amendments by the trial court's jury instructions which failed to instruct the jury that Petitioner must personally harbor a specific intent to kill in order to be found guilty of first-degree murder."). Mr. Simpson contends that with respect to the specific intent related to the first-degree murder charge, the trial judge erred by providing ambiguous instructions when giving the conspiracy and accomplice charges. *See also* Supplemental Petition, p. 1 ("The instructions permitted the jury to convict[ ] the Petitioner on the basis of the specific intent of an accomplice or co-conspirator and/or the specific intent to rob and not kill.")

For example, with respect to the conspiracy charge, the trial judge offered the instructions that "after considering all of the evidence, [the jury] find[s] that the Commonwealth has established beyond a reasonable doubt each of the elements of the crime of conspiracy, and that a particular overt act was done in pursuance and in furtherance of the conspiracy, *by the defendants or their accomplice or co-conspirator, you should find the defendant guilty of the charges*. Otherwise, you

must find the defendants not guilty." Simpson Amended Petition, p. 33. (emphasis added). According to Mr. Simpson, these instructions failed to identify the specific charges referenced, "or the substantive crime or crimes which were the alleged objects of the conspiracy. *Id.*, p. 34. Simply put, "[a] juror could reasonably believe that a defendant could be found guilty of first-degree murder if he was part of a conspiracy to commit *any* of the charged crimes, even if he did not possess the specific intent to kill." *Id.*

Mr. Simpson also takes issue with the general use of the term "these crimes" in the accomplice and conspiracy charges, and asserts that "this one-size-fits-all language . . . [again] communicates to the jury that this instruction covers *all of* the crimes charged against [Mr. Simpson], including first-degree murder. This instruction effectively negates the impact of the specific intent instruction for first-degree murder which was briefly given thirteen and twenty-one pages earlier." *Id.*, p. 36 (emphasis in original). Moreover, the parties dispute whether Mr. Simpson has exhausted his claim on direct appeal. And if so, whether Mr. Simpson has suffered the requisite prejudice to be granted relief.

Consequently, before addressing the merits of Mr. Simpson's claim, the Court must first determine whether Mr. Simpson gave sufficient notice of the claim on direct appeal. Because the Court determines he did, and that the Pennsylvania Supreme Court did not address the issue on the merits, the Court conducts a *de novo* review of the claim.

a. Exhaustion of the federal due process claim

The parties do not dispute that the attorneys for both Mr. Bowers and Mr. Simpson timely objected to the jury instructions at trial, which preserved the claim for appeal. Rather, the question before this Court is whether Mr. Simpson properly appealed the *federal* due process claim, thereby preserving it for his federal habeas proceedings.

Mr. Simpson alleges that the federal due process claim was "fairly presented" to the state supreme court on direct appeal. He claims that he argued that the trial court erred in its jury instruction on accomplice and co-conspirator liability, and his citation to *Commonwealth v. Huffman*, 638 A.2d 961 (1994), which relied on federal law, fairly gave notice to the state court of his federal due process claim.[8]   The Commonwealth contends that Mr. Simpson defaulted on his federal due process claim because his appellate brief challenged the propriety of the jury instructions exclusively as a matter of Pennsylvania law.

As noted, the relevant exhaustion rule requires that a petitioner fairly present its federal claims before the state court prior to bringing them in federal court. "To 'fairly present' a claim, a petitioner must present a federal claim's factual and legal substance to the state courts in a manner that puts them on notice that a federal claim is being asserted." *McCandless*, 172 F.3d at 261 Although a petitioner cannot simply state "a somewhat similar state-law claim" to raise a federal claim, the petitioner also need not cite to an exact provision of the federal constitution. *Id.*  Instead, "petitioners must have communicated to the state courts in some way that they were asserting a claim predicated on federal law." *Id.*

The Court of Appeals for the Third Circuit has "observed that the required message can be conveyed through '(a) reliance on pertinent federal cases employing constitutional analysis, (b) reliance on state cases employing constitutional analysis in like fact situations, (c) assertion of the claim in terms so particular as to call to mind a specific right protected by the Constitution, and (d) allegation of a pattern of facts that is well within the mainstream of constitutional

---

[8]      The heading for this section of Mr. Simpson's appellate brief made no reference to whether he was making a state claim, federal claim, or both.  The heading simply stated that "the trial court erred in refusing to instruct the jury that a defendant cannot be held culpable for first-degree murder as an accomplice or conspirator unless he personally harbors a specific intent to kill."  Simpson App. Br., *Commonwealth v. Simpson*, 1999 WL 33657534, *14 (Pa. 1999).

litigation.'" *Id.* at 261–62 (quoting *Evans v. Court of Common Pleas, Del. County, Pa.,* 959 F.2d 1227, 1232 (3d Cir. 1992)).

The Court determines that Mr. Simpson fairly presented his federal due process claim before the state court. As an initial matter, Respondents failed to raise the defense of a failure to exhaust in their response to Mr. Simpson's petition. It was only after the Court invited supplemental submissions in anticipation of oral argument on the at-issue claim that they raised the issue of Mr. Simpson's alleged failure to exhaust. *Compare* Respondents' Response, p. 21 ("This claim was rejected by the state courts, which found that the jury instruction was unambiguous, thorough, and accurate as to the specific intent requirement. That holding was, at a minimum, reasonable in light of the facts of record and compatible *with federal law*.") (emphasis added) *with* Respondents' Supplemental Brief, pp. 2–3 ("At no point did Simpson's appellate counsel develop any *federal* due process claim whatsoever, nor did he argue that the jury instructions violated the specific intent requirement under *federal* standards.") (emphasis in original). Subsection b(3) of 28 U.S.C. § 2254 states "a State shall not be deemed to have waived the exhaustion requirement, or be estopped from reliance upon the requirement unless the State, through counsel, expressly waives the requirement." However, the court "need not determine whether [Respondents] expressly waived the exhaustion requirement because [it] hold[s] that [Mr. Simpson] did exhaust his federal due process claim." *Bennett*, 886 F.3d 280.

A district court in this jurisdiction has determined in a factually analogous case the same issue before this Court—namely, that the petitioner exhausted his state remedies because he had cited to *Commonwealth v. Huffman*, the same case cited by Mr. Simpson in his direct appeals brief. In *Bridges v. Beard*, 941 F. Supp. 2d 584, 632 (E.D. Pa. 2013), *as amended* (May 1, 2013), *aff'd sub nom. Bridges v. Sec'y of Pa. Dep't of Corr.*, 706 F. App'x 75 (3d Cir. 2017), a petitioner had

challenged "the trial court's instructions to the jury about accomplice and conspiracy liability [because the instructions] permitted the jury to find him guilty without proof beyond a reasonable doubt of all the elements of first-degree murder required under Pennsylvania law." *Id.* at 632. The court held:

> Bridges challenged these instructions on direct appeal. *Bridges I,* 757 A.2d at 876–77. In presenting his jury-instruction challenge to the Pennsylvania Supreme Court, he relied on state cases that apply the relevant federal standard. *See* Direct Appeal Br. 54 (citing *Commonwealth v. Huffman,* 536 Pa. 196, 638 A.2d 961 (1994) (citing *In re Winship,* 397 U.S. 358, 90 S. Ct. 1068)); *id.* at 57 (citing *Commonwealth v. Thompson,* 543 Pa. 634, 674 A.2d 217 (1996) (applying *Huffman*)). Thus, Bridges exhausted his available state-court remedies for Claim III by fairly presenting the federal claim on direct appeal. I will proceed to the merits.

*Id.* at 632.[9]

As noted, in *Huffman*, the Pennsylvania Supreme Court found that jury instructions were invalid because they had failed to distinguish between the specific intent required to convict for first-degree murder and shared intent permitted for a conspiracy conviction. 638 A.2d at 962–63. And, *Huffman* applied the federal standard set forth in *In re Winship* when determining so. The court stated:

> It is clear that—to the extent which the jury relied on the contested instruction as the jury was instructed that it was obliged to do—the Commonwealth was improperly relieved of its burden of proving beyond a reasonable doubt a critical element of the crime of first degree murder, that the appellant possessed the specific intent to kill. Under the contested instruction, the jury needed to find only that the appellant had conspired to commit or assisted in a burglary with the actual murderer in order to find him guilty. Permitting such a faulty verdict to stand would be to tolerate a miscarriage of justice. The Commonwealth must prove all of the elements of a crime beyond a reasonable doubt. *In re Winship,* 397 U.S. 358, 90 S. Ct. 1068, 25 L.Ed.2d 368 (1970).

---

[9]     The court ultimately determined that the claim was meritless because the jury instructions met the minimum federal due process standards. *Id.* at 633. The Court of Appeals for the Third Circuit affirmed the decision on other grounds and did not address this claim. *See Bridges,* 706 F. App'x 75 (3d Cir. 2017).

*Id.* at 963.

In his direct appeal brief, Mr. Simpson cited *Huffman* for the same proposition that the court in *Huffman* cited *In re Winship*. That is, that because the jury instructions had failed to clarify that to be convicted as a conspirator or accomplice with respect to the first-degree murder charge, the conspirator or accomplice himself had to harbor specific intent to kill, the Commonwealth was relieved of its obligation to prove specific intent beyond a reasonable doubt.[10] And such an instruction was a miscarriage of justice. Simpson App. Br., 1999 WL 33657534, at *14-17.

Recently, in *Bennett v. Superintendent Graterford SCI, supra,* our circuit court also noted that *Huffman* "arguably" has constitutional underpinnings because it cites to *In re Winship.* 886 F.3d at 284 n.14.

Under the particular circumstances of this case and in light of the applicable case law, the Court is persuaded that Mr. Simpson presented the factual and legal substance of his federal claim to the state supreme court on direct appeal, sufficient to put it on notice of his federal claim. *See also Harmon v. Lamar*, 640 F. App'x 175, 179 (3d Cir. 2016) (concluding that the petitioner's reliance on a state court case that applied a constitutional analysis to similar facts was enough to put the state court on notice that the petitioner was asserting a federal double jeopardy claim).[11]

---

[10]     *Cf. McCandless*, 172 F.3d at 262 n.3 (concluding that, although the petitioner's "state court briefs cited two federal cases considering claims of prosecutorial vouching, these cases did not reach constitutional issues for the propositions for which they are cited.").

[11]     *C.f. McCandless*, 172 F.3d at 262–63 (concluding that the petitioner did not fairly present double hearsay and prosecutorial vouching claims to state courts because he relied exclusively on state cases that applied state evidence law); *Furman v. Sauers*, No. 11-4342, 2013 WL 4547847, at *6 (E.D. Pa. Aug. 28, 2013) (concluding that a petitioner had not exhausted his due process claim because he had only argued that the court misapplied a state evidentiary standard and "did not invoke the federal Constitution, the due process clause, or rely on any federal case law or state case law grounded in constitutional analysis.").

41

Consequently, the Court determines that Mr. Simpson did exhaust his federal due process claim in the state courts.[12]

   b. Whether the state supreme court determined Mr. Simpson's federal due process claim on the merits.

The Court next determines whether the Pennsylvania Supreme Court in this case determined the federal due process claim on the merits. If the state court determined the question on the merits, the Court must give AEDPA deference to the state court's determinations. If the state court did not address the claim on the merits, the Court employs a *de novo* review. This question is a close call.

In *Bennett*, Third Circuit Court of Appeals reiterated the applicable standard set forth in *Johnson v. Williams*, 568 U.S. 289 (2013), for when a federal court must determine whether a state court addressed a federal claim on the merits. When a federal claim has been presented to a state court, and "where the "state court rules against the defendant and issues an opinion that addresses some issues but does not expressly address the federal claim in question[,]" the federal court presumes that the state court addressed the federal claim on the merits. *Bennett*, 886 F.3d at 282. As the Supreme Court explained, the presumption applies because state courts have "very heavy" caseloads, and their opinions tend to "get to the heart of cases presented and dispose of them expeditiously." *Williams*, 568 U.S. 298-300. Therefore, "it is by no means uncommon for a state court to fail to address separately a federal claim that the court has not simply overlooked." *Id.* at 300.[13]

---

[12]     The Court concludes so, notwithstanding the fact that Magistrate Judge Lloret found that Mr. Bowers had not exhausted his federal due process claim before the state courts on direct appeal. First, notably, Mr. Bowers had conceded before Magistrate Judge Lloret that on direct appeal, a federal due process claim was not presented. Second, Magistrate Judge Lloret's Report and Recommendations were determined prior to the Third Circuit Court of Appeals rendered its decision in *Bennett*, *supra*.

The presumption may be rebutted. *Bennett*, 886 F.3d at 282 (citing *Williams*, 568 U.S. at 298. The *Williams* "presumption may be overcome when there is reason to think some other explanation for the state court's decision is more likely." *Harrington v. Richter*, 562 U.S. 86, 99–100 (2011). Of pertinence, other explanations that may sufficiently rebut the presumption that a federal claim was adjudicated on the merits include that the state court may have applied a state standard that is at least, less protective or quite different from the federal standard. *Bennett*, 886 F.3d at 283. "Where the . . . presumption is rebutted for one of these, or any other reason, review of the claim is *de novo*." *Id.* (citing *Williams*, 568 U.S. at 301-02).

However, where a state supreme court does not perceive itself to be deciding any federal claim presented, the Third Circuit Court of Appeals has determined that the *Williams* presumption does not apply at all. *Bennett*, 886 F. 3d at 278 (finding the presumption did not apply because the state court explicitly stated the federal due process claim had been defaulted, and despite the appellant's citations to federal case law, the state court determined it was not bound by federal law on a state law question).

Here, the question as to whether the *Williams* presumption applies is not so distinctly cut as it was in *Bennett*, because when addressing Mr. Simpson's direct appeal, the state supreme court was not explicit in finding that it did not perceive itself to be addressing a federal due process claim. In the absence of this explicit understanding, the Court applies the rebuttable presumption set forth in *Williams*. Notwithstanding, the Court finds the presumption is rebutted because the state court applied a state standard that is less protective from the federal standard, indicating "there

---

[13]     The Supreme Court also noted "[a] judgment is normally said to have been rendered 'on the merits' only if it was delivered after the court ... heard and *evaluated* the evidence and the parties' substantive arguments. And as used in this context, the word 'merits' is defined as *the intrinsic rights and wrongs* of a case as determined by matters of substance, in distinction from matters of form. If a federal claim is rejected as a result of sheer inadvertence, it has not been evaluated based on the intrinsic right and wrong of the matter." *Williams*, 568 U.S. at 302.

is reason to think some other explanation for the state court's decision is more likely." *Richter*, 562 U.S. at 99–100 (2011); *see also Bennett*, 886 F.3d at 283-84 ("[E]ven if the *Williams* presumption were to apply, we would conclude that Bennett has rebutted it.")

When deciding Mr. Simpson's direct appeal, the state supreme court cited and relied on all state supreme court decisions for its determination that the trial court adequately instructed the jury on specific intent with respect to vicarious liability. It cited its previous decisions in *Commonwealth v. Wayne*, *Commonwealth v. Thompson*, and *Commonwealth v. Chester*, all cases which the Court has addressed at length *supra*, holding the jury instructions given at Mr. Simpson's trial passed muster under these state law decisions. It then differentiated *Huffman* as inapplicable to the case at bar.

The court cited *Wayne* for the state law proposition that the general rules of conspiracy cannot be applied to first-degree murder because a first-degree murder charge requires a finding of specific intent. *Simpson*, 754 A.2d at 1274 ("In reconciling the conflict between conspiratorial liability and the specific intent requirement of first-degree murder presented in *Wayne,* this Court concluded that a pure application of the principles of conspiratorial liability to the crime of first-degree murder would improperly relieve the Commonwealth of its burden of proving that the defendant personally maintained the specific intent to kill. Relying on the reasoning of our decisions in *Commonwealth v. Huffman,* 536 Pa. 196, 638 A.2d 961 (1994) and *Commonwealth v. Bachert,* 499 Pa. 398, 453 A.2d 931 (1982), this Court concluded that, because of the seriousness of the penalty involved, the specific intent element of first-degree murder should be elevated above principles of conspiratorial liability. Consequently, [the court] stated that, '[t]o be guilty of first degree murder, each co-conspirator must individually be found to possess the mental state

necessary to establish first degree murder—*the specific intent to kill.*'") (citing *Wayne*, 720 A.2d at 464)).

With respect to its citations to *Thompson* and *Chester*, the court determined the jury instructions were like the instructions the state court had already found were adequate in those decisions, as a matter of state law. After an independent review of the decisions in *Thompson* and *Chester,* the Court finds those decisions do not have federal constitutional underpinnings. Moreover, the *Simpson* Court cited to *Thompson* for the additional state law proposition that "the trial court is not required to deliver its instructions regarding first-degree murder and those regarding accomplice and conspiratorial liability in a prescribed manner." *Simpson*, 74 A.2d at 1275-76 (citing *Thompson*, 674 A.2d 222-23).

Immediately after finding that Mr. Simpson's jury instructions met the standards of *Wayne*, the state supreme court then distinguished *Huffman*, and concluded that the at-issue instructions in the Simpson trial were nothing like those found to be deficient in *Huffman*. When differentiating *Huffman*, the court found:

> We are unconvinced by [Mr. Simpson's] attempt to analogize the jury instructions in the present proceedings to those given in *Huffman*. In the instant case, the trial court stressed in its instructions to the jury that [Mr. Simpson's] state of mind as it related to the charge of first-degree murder was to be examined separately and independently from that of his co-conspirators. Also, the trial court in this case communicated to the jury that [Mr. Simpson] had to maintain his own specific intent to kill in order to support a finding of first-degree murder. The trial court's later instructions pertaining to accomplice and conspiratorial liability did not detract from the clear message that the jury must find that the [Mr. Simpson] had the specific intent to kill to support a first-degree murder conviction.

*Simpson*, 74 A.2d at 1276.

As an initial matter, the Court notes the challenges presented by the need to determine, as a matter of retroactive effort, the reasons why a state court has made the determinations it has made, or why it has cited specific case law, when it itself has not explicitly explained why. One could argue that the *Simpson* Court addressed the due process claim on the merits of federal law, because it considered *Huffman*, which clearly cites to United State Supreme Court precedent, and *Wayne*, a decision that relies on *Huffman*.

However, when the decision is read as a whole, that analysis seems less plausible. Again, the Third Circuit Court of Appeals decision in *Bennett* is instructive here. In a footnote on the question of whether the state court had addressed the federal due process claim on the merits, our appellate court in *Bennett* determined:

> We note, furthermore, that unlike *Williams* the Pennsylvania Supreme Court did not 'underst[an]d itself to be deciding a question with federal constitutional dimensions.' *Williams*, 568 U.S. at 305, 133 S.Ct. 1088. The Court relied upon two state cases, *Thompson* and *Simpson*, which do not have federal constitutional underpinnings. *See Bennett VI*, 57 A.3d at 1198– 99 (citing *Thompson*, 674 A.2d at 223, and *Simpson*, 754 A.2d at 1275–76). The Pennsylvania state case that arguably does have federal constitutional underpinnings is *Huffman*, which cites *In re Winship* for the proposition that a meritorious jury instruction claim did not amount to harmless error. *Huffman*, 638 A.2d at 963 (citing *In re Winship*, 397 U.S. 358, 90 S.Ct. 1068, 25 L.Ed.2d 368 (1970) ). *Huffman*, however, is the very case that the Pennsylvania Supreme Court held was inapplicable to Bennett. *Bennett VI*, 57 A.3d at 1187; *see also id.* at 1203 ("As we have made clear, the instant case is simply not controlled by *Huffman* . . . ."). As Chief Justice Saylor put it, "the only surviving vestige of *Huffman* is that which remains to be litigated in the federal courts under due process theory." *Bennett VI*, 57 A.3d at 1208 n.3 (Saylor, C.J., concurring) (quoting *Commonwealth v. Jones*, 590 Pa. 202, 912 A.2d 268, 297 (Pa. 2006) (Saylor, C.J., concurring)).

*Id.* at 284 n. 14.

In other words, the court of appeals noted that *Simpson* and *Thompson* were state court decisions applying state legal standards to the issue at hand. Moreover, the *Bennett* state court distinguished *Huffman*, which arguably is the only link to federal due process law. For these reasons, the federal court determined the presumption that the state court had determined the federal claim on the merits was rebutted.

The Court similarly determines here that the *Simpson* Court failed to address the federal due process claim on the merits. On balance, the state court relied only on state case law and state law principles when determining Mr. Simpson's challenge on the basis of the federal due process claim, and these standards are less protective than the applicable federal standard sufficient to rebut the *Williams* presumption.

     c.  *De novo* review of the federal due process claim

### i.  Analysis of the merits

Because the state court did not address the federal due process claim, Mr. Simpson is entitled to *de novo* review of his claim. *See Bennett*, 886 F.3d at 281 (citing *Cone*, 556 U.S. at 472) ("If a claim was not adjudicated on the merits in state court, we review legal questions and mixed questions of law and fact *de novo*."). In this scenario, the state court's factual determinations are presumed to be correct which may be rebutted by clear and convincing evidence. *Id.* at 282 (citing *Appel*, 250 F.3d at 210).

The first question on *de novo* review is whether the trial instructions Mr. Simpson challenges violate federal due process standards. Notably, at oral argument, Respondents conceded the point. They also appear to do so in their supplemental briefing. Thus, the Court need not belabor the issue, but will address the point.

47

"While the state may choose how to define first degree murder, *McMillan v. Pennsylvania*, 477 U.S. 79, 85 (1986), the Constitution requires proof beyond a reasonable doubt of every element necessary to constitute the crime, *In re Winship*, 397 U.S. at 364." *Bennett*, 886 F.3d at 285. "Due process is violated when a jury instruction relieves the government of its burden of proving every element beyond a reasonable doubt." *Id.* (citing *Waddington v. Sarausad*, 555 U.S. 179, 190–91 (2009); *Sandstrom v. Montana*, 442 U.S. 510, 521 (1979)). "Under the federal due process standard, we ask whether there is 'some ambiguity, inconsistency, or deficiency in the instruction, such ... that there was a reasonable likelihood that the jury applied the instruction in a way that relieved the State of its burden of proving every element of the crime beyond a reasonable doubt.'" *Bennett,* 886. F.3d at 285 (citing *Waddington*, 555 U.S. at 190–91, 129 S. Ct. 823) (additional citations omitted). The Court looks to the jury instructions as a whole and the trial record in making this determination. *Id.*

As the Third Circuit Court of Appeals determined in *Smith v. Horn*, *Laird v. Horn*, and *Bennett*, *supra*, the Court finds the instructions violate Mr. Simpson's federal due process rights because it was reasonably likely that the ambiguous vicarious liability instructions permitted a jury to convict Mr. Simpson of first degree murder as a conspirator or accomplice of a different crime. The instructions in both the conspiracy and accomplice portions referred to "these crimes" or "these charges," without differentiating between the various charges lodged against Mr. Simpson. They otherwise failed to differentiate between the object of conspiracy, robbery or murder, such that a jury could believe an intent to conspire as to one crime constituted the intent as to the other. For example, Mr. Simpson cites to the following jury instruction:

> In order to find the defendants guilty of conspiracy, you must be
> satisfied initially that the following two elements of the conspiracy
> have been proved beyond a reasonable doubt: First, that the
> defendants agreed with each other or another person or persons that

48

> they engage in conduct which constitutes the crimes of robbery, and/or murder, or agreed to aid each other or another person or persons in the planning or commission of the crimes of robbery or murder. And second, that the defendants did so with the intent of promoting or facilitating commission of these crimes.

Amended Petition, p. 31.

That is, the instructions failed to differentiate or make clear that a conspirator or accomplice to either the robbery or killing had to himself be found to have specific intent to kill in order to be liable for first-degree murder. And failure to so clarify permitted the jury to find Mr. Simpson guilty of first-degree murder even if he did not harbor the requisite *mens rea*. This is so, even when considering the arguably correct first-degree murder charge, and the trial court's reiteration to the jury after giving all of the jury instructions that as to a first-degree murder conviction, a defendant must have the specific intent to kill. Again, this Court has no way of determining with conclusiveness which instructions the jury used to convict Mr. Simpson. Thus, such vague instructions, when considering all of the instructions as a whole, relieved the Commonwealth of its burden of proving Mr. Simpson had the specific intent to kill, in violation of Mr. Simpson's due process rights under the United States Constitution. *See Laird*, 414 F.3d at 427–28 ("Given that context, we can not conclude that such a brief reference to the required *mens rea* for first-degree murder remedies the incorrect and misleading portion of the instruction.")

### ii.  Harmless error

A constitutionally infirm set of instructions is not enough to secure federal habeas relief. Indeed, it is not the ambiguity or confusion alone that gives rise to federal habeas relief. Rather, the ultimate question is whether the deficient instructions nonetheless constituted harmless error.

To determine if an error was harmless, the Court must look to "'whether the error had substantial and injurious effect or influence in determining the jury's verdict.'" *Smith*, 120 F.3d at

417. If the Court is certain that any error did not influence the jury, or any influence was only very slight, then the verdict must stand. *Adamson v. Cathel*, 633 F.3d 248, 260 (3d Cir. 2011) (citing *O'Neal v. McAninch*, 513 U.S. 432, 436 (1995)). "If our analysis causes us 'grave doubt' about the integrity of the verdict, it can not be deemed harmless, and [the petitioner] is entitled to relief." *Laird*, 414 F.3d at 428 (quoting *Smith*, 120 F.3d at 418)); *O'Neal*, 513 U.S. at 437. "'The crucial inquiry is the impact of the error on the minds of the jurors in the total setting. It is thus inappropriate to ask whether there was sufficient evidence to support the result, apart from the phase of the trial affected by the error. The correct inquiry is whether the error had a substantial influence on the verdict despite sufficient evidence to support the result apart from the error.'" *Smith*, 120 F.3d at 418 (citing *Yohn v. Love*, 76 F.3d 508, 523 (3d Cir. 1996)).

The Court determines that the error in the jury instructions, in light of the entire trial record, was not harmless. Again, Third Circuit precedent is key.

In *Smith v. Horn*, *supra*, our circuit court determined the error in the vicarious liability instructions was not harmless. There, the court took issue with the conspiracy and accomplice instructions which allowed for the petitioner to be convicted of first-degree murder despite having only been found to have participated in conspiracy to commit robbery. Even where the evidence showed that it was more likely that the petitioner had killed the victim, not his accomplice, the appellate court opined that such evidence was not the equivalent of, nor could it embrace the requisite finding that beyond a reasonable doubt, Mr. Smith had killed the victim. 120 F.3d at 418 ("We cannot say that a finding that either Smith or Alston killed Sharp is so closely related to a finding that Smith killed Sharp, in light of the evidence presented, that no rational jury that made the former finding would have failed to make the latter finding.")

50

In *Laird,* 414 F.3d 419, the court determined the error in the accomplice instruction was not harmless on the basis that (1) the jury might have believed that Mr. Laird intended to kidnap and/or assault the victim, but that only Mr. Chester intended to kill him, (2) "the conspiracy instruction clearly allowed the jury to convict for first-degree murder without a finding that each conspirator had the specific intent to kill as long as the killing was 'in furtherance' of the kidnaping or assault Laird had been charged with," and (3) despite there being evidence to support the conclusion that Mr. Laird had intentionally killed the victim, the court would not substitute itself for the jury by speculating about what portion of the testimony the jury believed. *Id.* at 429.

Here, as noted, the state court's factual determinations on Mr. Simpson's direct appeal are presumed to be correct, unless they are rebutted by clear and convincing evidence. Indeed, the Commonwealth relies on these findings and contends that the evidence of Mr. Simpson's guilt was overwhelming because he had identified himself to Mr. Hall on the phone, and made explicit threats to him and the victim's brother that he would kill the victim if the ransom money was not produced.

The state supreme court found that Mr. Simpson and three other men had abducted Mr. Haynes and brought him to Ms. Washington's apartment. Ms. Washington then observed the group beat the victim and the money. The state court did not cite Mr. Simpson as the sole aggressor in the beating. The state court also found that at trial, the evidence showed the group placed telephone calls threatening to kill the victim if his family could not meet the ransom. In at least one of these calls, Mr. Simpson was identified as the caller who made a threat to kill Mr. Haynes. Furthermore, the state court found that a week after the murder, Mr. Simpson was found with Mr. Bowers when Montgomery County police arrested Mr. Bowers and confiscated a gun, which was used at trial for the limited purpose of showing the opportunity to commit a crime.

Even giving deference to these findings of fact, and when considering the applicable case law and record as a whole, the Court cannot be certain any error in the constitutionally infirm accomplice and conspiracy liability instructions was very slight. In fact, the Court has grave concerns as to whether the jury properly convicted Mr. Simpson of first-degree murder when the vicarious liability instructions permitted the jury to convict him only on the basis of him being an accomplice or conspirator in the robbery.

As another example of the flawed instructions, Mr. Simpson cites to the following accomplice instruction:

> Now, you may find a defendant guilty of *crimes* on the theory that he was an accomplice as long as you're satisfied beyond a reasonable doubt that the crime was committed, that the defendant was an accomplice of the person or persons who committed it. It does not matter that another person or persons who you believe committed the crime has not been prosecuted or convicted or *has been convicted of a different crime or degree of crime* or has an immunity from prosecution or anything else.

Simpson Amended Petition, p. 35.

Based on instructions such as this, the jury could have convicted Mr. Simpson of the offense only after finding he had the intent to commit a less severe crime. But in this case, where the risk is the death sentence, permitting such a conviction to stand would be an act of manifest injustice.[14] Assuming *arguendo* the fact that Mr. Simpson made at least one ransom call, he was found with Mr. Bowers at the Cheltenham Mall when Mr. Bowers was arrested, and that he was among the group that kidnapped and beat Mr. Haynes, such evidence is consistent with Mr. Simpson conspiring to *rob* Mr. Haynes. Even if the evidence supports a finding of specific intent

---

[14] This is even more so because the Commonwealth's theory in the case against Mr. Simpson was to convict him as an accomplice or co-conspirator to the killing. As Mr. Simpson cites, the prosecutor argued to the jury that the defendants were "in for a penny, in for a pound. That means, if you help them, you aid them, you're in for the whole thing. Because we don't know who really pulled the trigger, do we?" Amended Petition, p. 41.

to kill, mere consistency with a first-degree murder conviction does not suffice under the federal standard. That is, the Court cannot and will not substitute its judgment for that of a jury, and speculate as to what portions of the jury instructions were relied upon when the jury convicted Mr. Simpson of first-degree murder.

Where an underlying case, like this one, involves multiple defendants and multiple objects of a conspiracy, and where the instructions or the convictions do not make it clear that a jury could not have convicted a defendant on first-degree murder without finding his specific intent to kill, *see Bronshtein*, 404 F.3d at 710 (finding harmless error because the petitioner was also convicted of conspiracy to commit murder and, as such, the jury must have concluded that he possessed the specific intent to kill), it is all the more critical that the jury instructions with respect to vicarious conduct be clear and precise. Indeed, the consequences would be dire to let the present first-degree murder conviction stand. Such an error under these circumstances cannot satisfy due process concerns.[15]

---

[15]     In supplemental briefing, Respondents appear to have abandoned their contention that the state court opinion is due AEDPA deference. They contend that the federal due process claim was not fairly presented to the state court on direct appeal, and also appear to concede that even if federal law was violated, the infirmity in the jury instructions was harmless. Consequently, the Court need not consider whether Mr. Simpson's due process claim meets the standards set forth under AEDPA deference. Assuming *arguendo*, that the state court did consider Mr. Simpson's federal due process claim on the merits, the Court also finds that the adjudication of the claim "resulted in a decision that . . . involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States[.]" 28 U.S.C. § 2254(d)(1). With respect to "the 'unreasonable application' clause, a federal habeas court may grant the writ if the state court identifies the correct governing legal principle from [the Supreme] Court's decisions but unreasonably applies that principle to the facts of the prisoner's case." *Williams v. Taylor*, 529 U.S. 362, 413 (2000). Federal law clearly holds that each element of a crime must be proven beyond a reasonable doubt. And, it is a violation of federal law if jury instructions relieve this burden of proof. *See Bridges*, 941 F. Supp. 2d at 594 ("For these purposes, 'clearly established federal law' means 'the governing legal principle or principles set forth by the Supreme Court at the time the state court renders its decision.') Such is the case, indelibly, when a defendant is charged with the serious offense of first-degree murder. Because the state supreme court determined that *Huffman* did not apply to Mr. Simpson's claim, and perhaps, in essence, determined that federal due process was not violated, it unreasonably applied clearly established federal law that to convict Mr. Simpson as a conspirator or accomplice, the Commonwealth must have proven beyond a reasonable doubt that he possessed the requisite specific intent to kill. *See also Bridges*, 941 F. supp. 2d at 633 (citing *Waddington*, 555 U.S. 179 (2009) ("As a matter of clearly established federal

## CONCLUSION

Ultimately, the state court determined that four men kidnapped, beat, and tried to rob Mr. Haynes. One or all of those men then killed Mr. Haynes, but there was no factual finding by the state court that one specific person killed Mr. Hayes. Under the circumstances of this multi-object, multi-defendant conspiracy, the Court determines that where the jury instructions confused the intent necessary to convict on first-degree murder, vis-à-vis vicarious conduct, Mr. Simpson is entitled to federal habeas relief.

An appropriate order follows.

**BY THE COURT:**

_____

**GENE E.K. PRATTER**
**UNITED STATES DISTRICT JUDGE**

---

law, a challenged jury instruction must be read in light of the charge as a whole.")) Thus, for the same reasons the Court determines the error in the jury instructions violated federal due process and were not harmless under *de novo* review, the Court determines the vicarious liability instructions permitted the jury to apply the instructions in a way that relieved the Commonwealth of its burden of proof at trial. *Waddington v*, 555 U.S. at 190–91, ("[T]he defendant must show both that the instruction was ambiguous and that there was "'a reasonable likelihood'" that the jury applied the instruction in a way that relieved the State of its burden of proving every element of the crime beyond a reasonable doubt. . . . In making this determination, the jury instruction 'may not be judged in artificial isolation,' but must be considered in the context of the instructions as a whole and the trial record.' Because it is not enough that there is some 'slight *possibility*' that the jury misapplied the instruction, the pertinent question is 'whether the ailing instruction by itself so infected the entire trial that the resulting conviction violates due process.'") (internal citations omitted).